UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

_____

|  |  |  |
|---|---|---|
| DOUGLAS FLANERY, on behalf of himself and all others similarly situated, | : : : | CASE NO. 19-CV-277 |
| Plaintiff, | : : : | JURY TRIAL DEMANDED |
| v. | : : | |
| FORD MOTOR COMPANY, | : : | |
| Defendant. | : : : | |

## CLASS ACTION COMPLAINT

Plaintiff Douglas Flanery ("Plaintiff"), by and through his counsel, Hansen Reynolds LLC and Denlea & Carton LLP, respectfully files this Class Action Complaint on behalf of himself and a class of similarly-situated Ohio consumers who are current or former owners or lessees of Ford F-150 vehicles for model years 2015-2018, and allege as follows:

## NATURE OF THE CASE

1.      For 40 years, the Ford F-Series has been the best-selling pickup truck in the United States by a significant margin.  Indeed, in January 2017 57,995 of the          F-Series vehicles were sold, compared to 35,553 Chevrolet Silverado pickup trucks, the number two selling truck in the market.

2.      Ford achieves its superior sales, in part, by failing to disclose critical information about its vehicles, leaving the misimpression that they are able to stand up to the harshest conditions.  Sadly, this purportedly rugged and tough vehicle possesses an elemental defect: its doors won't lock and latch properly when the temperature drops below freezing – this is a condition Ford created and has known about for years, but about which it has failed to inform consumers.

3.      On its website, Ford is pleased to make extravagant claims about vehicle construction to the consumer.  "We design by the principle that the best truck for today is the one engineered to meet the challenge of performance, efficiency and dependability, long into the future.  So we subjected F-150 to over 10 million miles of cumulative torture-testing to earn its Built Ford Tough® badge.  And it more than delivered."  Yet, while Ford was at the trademark office, registering its self-aggrandizing "Built Ford Tough" mark, it neglected one significant fact.  The doors on the truck won't stay closed in the cold.  Ford knew that this problem existed and yet it continued to mislead the consumer with marketing claims about quality, durability and dependability.

4.      Ford quietly issued not one, but two, technical service bulletins to address the problem.  Technical service bulletins (TSB's) are notices sent to dealership service departments, alerting them as to a problem with a vehicle, yet without notifying the public or going through the expense of a recall.  Despite two technical service bulletins on this precise defect, Ford was unable to correct the problem.  Plaintiff went to the dealer multiple times to fix the defective latch, all to no avail.

5.      Ford is no stranger to door latch defects.  In September, 2016, Ford spent $640 million to repair latches on 2.4 million Ford Mustangs; Escapes; Focus; Lincoln MKC and the Ford Transit Connect Van.  In those cases, a spring tab would break in high temperatures, causing doors to "pop open" (*New York Times*, September 8, 2016).  In this setting, cold temperatures prevent the latch from staying engaged.

6.      Ford has issued two other major notices related to the ongoing defects with its F-150 vehicles.  Ford issued Safety Recall 17S33 for F-150 model years 2015-2017.  The recall was necessary because, Ford explained, in "the affected vehicles, a frozen door latch, or bent or

2

kinked door latch actuation cable, may result in a door [that] will not open, [a] door [that] will not close, or [a] door opens while driving condition, increasing the risk of injury." Second, Ford issued "Customer Satisfaction Program 18N03," "to provide an additional repair for owners who have experienced frozen door latches." Despite these new programs, the fixes do not work and consumers continue to have problems with their F-150s.

7.       As a result, consumers have been injured by over paying for a product that has diminished value due to its defective nature. If Plaintiff had known what prospective subsequent purchasers now know, he would never have purchased his vehicle. And those prospective subsequent purchasers, now knowing of the defect, will either not purchase the vehicle or will offer a steeply discounted price, all of which constitutes a diminution of value and damage to Plaintiff.

8.       This matter is related to another case, *Kommer v. Ford Motor Co.*, No. 17-cv-296 (LEK)(DJS) (N.D.N.Y.) ("*Kommer*"), currently pending in the Northern District of New York. In *Kommer*, plaintiff Brandon Kommer, a New York purchaser of a 2015 F-150 XLT SuperCrew, relying on New York's consumer protection statute, has asserted a nearly identical claim, arising out of the same set of operative facts, to the one asserted by Mr. Flanery. Mr. Kommer has asked the Court in the Northern District of New York for permission to amend his complaint in order to add claims by consumers from Ohio, Indiana, Pennsylvania, and Arkansas, who similarly purchased defective F-150s. Mr. Flanery is the putative class representative for the Ohio consumers in the proposed amended complaint in the New York action. Mr. Kommer's motion, opposed by Ford, is fully briefed and awaiting a decision.

9.       Mr. Flanery has filed this action because he is concerned about the anticipated expiration of the limitations period for his claim for which Ford was unwilling to enter into a

3

tolling agreement.  As a result, Mr. Flanery has filed this action to protect his claim in the event

Mr. Kommer's motion to amend the New York action to include Mr. Flanery is not granted

before the limitations period expires.

10.     If Mr. Kommer's motion to amend his complaint is successful, Mr. Flanery will

withdraw this complaint and proceed to prosecute his claim in the New York action.  If Mr.

Kommer's motion to amend is unsuccessful, Mr. Flanery will proceed with this complaint, but

given the extensive similarities between the two actions, likely ask that discovery in his case be

coordinated with Mr. Kommer's case to preserve the parties' (and Courts') resources.

## THE PARTIES

11.     Plaintiff Douglas Flanery is a natural person of full age of majority who is

domiciled and resides in Greenville, Ohio.  On April 18, 2016, Mr. Flanery purchased a brand

new 2016 Ford F-150 Platinum SuperCrew vehicle from Kings Ford in Cincinnati, Ohio.

12.     Defendant Ford Motor Company is a Delaware corporation with its principal

place of business at One American Road, Dearborn, Michigan 48126.  Ford is in the business of

designing, manufacturing, and distributing motor vehicles, including its F-150 vehicles.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to the Class Action Fairness

Act of 2005, 28 U.S.C. § 1332(d).  Jurisdiction is proper because (1) the matter in controversy

exceeds the sum or value of $5,000,000.00, exclusive of interest and costs and (2) Plaintiff and

Defendant are citizens of different states.  28 U.S.C. §1332(d)(2)(A).

14.     The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a),

as the parties are diverse and the amount in controversy exceeds the requisite threshold.

15.     This Court may exercise jurisdiction over Ford because Ford is registered to

conduct business in Ohio, has sufficient minimum contacts in Ohio, committed the alleged

wrongdoing in Ohio, the parties contracted in Ohio for the purchase of the subject F-150, and

Ford intentionally avails itself of the markets within Ohio through the promotion, sale,

marketing, and distribution of its vehicles, thus rendering jurisdiction by this Court proper and

necessary.

16.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a

substantial part of the events giving rise to the claim occurred within this judicial district and

because Defendant has marketed and sold the product at issue in this action within this judicial

district and has done business within this judicial district.

## CHOICE OF LAW

17.     Ohio law governs the claims asserted herein by Mr. Flanery and the Ohio class he

seeks to represent.

## GENERAL ALLEGATIONS

**Ford's F-150 Vehicles Have A Material Defect**

18.     Ford F-Series vehicles have been the "best-selling trucks in America for 40

straight years."  (http://www.ford.com/ford-sales-events/40-years-leadership/, last visited Aug.

22, 2017.)

19.     Ford achieves this extraordinary sales goal, in part, by concealing and failing to

disclose material information about its F-150 vehicles from consumers – i.e., Defendant's F-150

trucks fail a basic requirement for any vehicle sold where the weather varies seasonally, like

Ohio: the doors won't properly latch closed or lock when the temperature drops below freezing.

**Locking Problems With Ford's F-Series Vehicles**

20.     Multiple online car forums detail the continuous and unresolved problems that

truck owners have had with the door latches in Ford's 2015, 2016, 2017, and 2018 F-150s.

21.     One 2015 F-150 SuperCab owner complained: "Whenever it's cold out, we're talking 20° F and below, the door will not latch when closed."

(http://www.f150forum.com/f2/2015-door-wont-latch-when-cold-328507/, last visited Mar. 1, 2017.)

22.     Another F-150 owner wrote: "I woke up this morning to below freezing temps. This is the second time I had this type of problem, my doors and locks weren't opening or unlocking. (http://www.f150forum.com/f118/doors-locks-freezing-326413/, last visited Mar. 1, 2017.)

23.     The same problems continued with 2016 F-150 owners.  One owner despaired "I have a 2016 F150 Sport. So the first hard freeze here in the NW, and I open my truck door, and it wont (sic) latch shut. I cycled the locks, I even used the keypad on the driver side, still no latch. I went and got a hair dryer, finally it latched. Did it the next morning too, so I went back to the dealer."  (http://www.torquenews.com/3768/2016-ford-f-150-owners-come-unhinged-over-cold-weather-latch-problems, last visited Mar. 1, 2017.)

24.     A fourth owner lamented "I got a 2016 XLT SuperCab and the last 2 mornings it was 12° and 1° and the door wouldn't stay closed. I had to get the WD40 out and slam the door pretty hard to go to work."  (http://www.torquenews.com/3768/2016-ford-f-150-owners-come-unhinged-over-cold-weather-latch-problems, last visited Mar. 1, 2017.)

25.     Ford is a major TV and print advertiser and its advertisements are ubiquitous throughout TV, newspapers, and magazines.  Yet none of these advertisements disclose to consumers this material defect, despite the fact that it has been known for years.

26.     Plaintiff, like most consumers, has seen and is aware of Ford's advertisements.

Plaintiff considered and was influenced by those advertisements, when Plaintiff decided to purchase his Ford 150 pickup truck.

27.     Indeed, Mr. Flanery had seen Ford's ads about the redesign of its Ford F-150 truck on television, the internet, and Facebook prior to purchasing the Ford vehicle.

28.     Those advertisements demonstrated and exhibited the supposed Ford reliability and durability and were a material factor in Plaintiff's decisions to purchase his vehicles. Significantly, Ford touts the quality of its materials and relates that claimed quality to further claims of durability and reliability.  As America's oldest car company at over 100 years, it was reasonable for Plaintiff to assume that the technology to open and close doors had been mastered.

**Ford Issues First Technical Services Bulletin**

29.     Ford has long known that its F-150 vehicles do not perform as they should and as any reasonable consumer would expect – to wit, with doors and locks that latch and unlatch properly when temperatures drop below freezing.  But Ford has failed to inform consumers about this ongoing serious and material defect to its best-selling F-150 vehicles.

30.     As early as April 8, 2015, Ford knew that some "2015 F-150 SuperCab and SuperCrew Cab vehicles built on or before 3/25/2015 may exhibit inoperative door latches during or after freezing temperatures."  (SUPERCAB/SUPERCREW CAB - FROZEN OR INOPERATIVE DOOR LATCH - BUILT ON OR BEFORE 3/25/2015, TSB 15-0052, attached as Exhibit A.)

31.     This technical services bulletin (or TSB) outlined the serious issue of inoperable door latches during and after freezing temperatures, the action needed to be taken by Ford's dealers and service providers, and the specific service procedure to fix the defect (though, as alleged above, the "fix" doesn't work).  In stark contrast, Ford provided no disclosure of the

7

defect to current, former, or potential owners, purchasers, or lessees of these F-150 vehicles.

32.    The TSB's recommended actions included: removing all interior door panels; removing all the center door latch assemblies; using compressed air to blow dry all of the center door latch assemblies after removal; using compressed air to blow dry all of the handle assemblies; installing new door latch assemblies on SuperCab vehicles; using grease or lubricant on the steel cable and all moving components of the center latch assemblies; using grease or lubricant and spraying the inside of all front and rear door exterior handles; reinstalling all center door latch assemblies; and reinstalling all of the interior door panels.

33.    But, as detailed above, Ford's F-150 customers continued to experience the same problems with Ford's 2015-18 F-150 vehicle models.

34.    Ford never made any affirmative disclosure about the problems outlined in TSB 15-0052.  Instead, it concealed the defect, did nothing to retrofit the doors with new equipment; made no design modifications; issued no recall; and continued to mislead the public with claims of quality and durability – both noticeably absent from the product.

**Ford Issues Second Technical Services Bulletin**

35.    The continued malfunction of the latches in Ford's 2015-2017 F-150 vehicle models resulted in Ford issuing yet another technical services bulletin.

36.    On November 18, 2016, Ford issued a broader and more detailed TSB to its dealers and service providers in an attempt to "fix" its ongoing problem.  (FROZEN OR INOPERATIVE DOOR LATCH DURING FREEZING TEMPERATURES, TSB 16-0155, attached as Exhibit B.)

37.    As with Ford's earlier TSB, Ford made no general, widespread disclosure of this continuing material defect to current, former, or potential owners, purchasers, or lessees of its F-

Series vehicles.

38.     This new TSB specifically superseded the earlier issued TSB 15-0052.

39.     Unlike the first TSB, this second TSB was not limited to the 2015 F-150 SuperCab and SuperCrew models built before March 25, 2015, but was expanded to include *all* F-150 models for *all* of *2015, 2016, and 2017*.

40.     TSB 16-0155 explained that "Some 2015-2017 F-150 vehicles may exhibit inoperative latches on front doors and/or SuperCrew rear doors during freezing temperatures." (Ex. B.)

41.     The TSB then set out the action needed to be taken and the service procedure to follow supposedly to remedy the defective condition.  Those actions included: removing both front door interior door panels on all vehicles and both rear door interior door panels only on SuperCrew vehicles; removing door water shields; verifying the latch release cable is properly seated and the cable end is properly installed on to the outer handle; if improper installation is found and the cable has become kinked, replacing the cable; removing both front door latch assemblies on all vehicles and both rear door latch assemblies on the SuperCrew vehicles; using compressed air to blow dry all the door latch assemblies after removal and all interior handle assemblies; replacing the door latch retaining brackets; installing the rain shield on the door latch brackets opposite the latch using Ford supplied hardware; potentially installing new door lock rods on all door latch assemblies; greasing or lubricating the steel cable and all moving exterior handle components while cycling the handle, all moving components of the latch assemblies, latch lock rod and all attachment points, and the inside of all front and rear door exterior handles; reinstalling all door latch assemblies; and reinstalling all of the interior door panels.

42.     Even after issuing this second, and broader, TSB, Ford still failed to disclose this

serious defect or to inform current, former, or potential Ford F-Series owners, purchasers, or lessees of this defect.

**Ford Issues Safety Recall**

43.     Ford continued to have problems with its F-150 door latches.  The issues became so problematic that in October 2017, Ford took the extraordinary step of informing its dealers it planned to issue Safety Recall 17S33 in November 2017.

44.     The reason for the safety recall, Ford explained, was because in "the affected vehicles, a frozen door latch, or bent or kinked door latch actuation cable, may result in a door [that] will not open, [a] door [that] will not close, or [a] door opens while driving condition, increasing the risk of injury."  (NEW VEHICLE DEMONSTRATION / DELIVERY HOLD – Safety Recall 17S33 – Advanced Notice, October 17, 2017, attached as Exhibit C.)

45.     Ford informed its dealers that the safety recall applied to all "F-150[s]" for model years 2015-2017.

46.     In November 2017, Ford first notified consumers that it was recalling for safety reasons all of its F-150 2015 – 2017 models.  (Important Safety Recall, November 2017, attached as Exhibit D.)[1]

47.     On December 13, 2017, Ford updated the "Service Action" for the Safety Recall, and instructed its dealers "to install door latch water shields in the affected doors and repair any kinks in the latch actuation cables."  (NEW VEHICLE DEMONSTRATION / DELIVERY HOLD – Safety Recall 17S33 – Advanced Notice, December 13, 2017, attached as Exhibit E.)

48.     Ford's December 13, 2017 notice also provided dealers a detailed parts list and repair instructions to guide dealers on how to effectuate the repairs required by the safety recall.

---

[1] The Safety Recall also applied to Ford F-Super Duty vehicles.

For all vehicles,[2] these actions included: removing the front door interior trim panels; removing the front door weather shields; inspecting the interior door handle to latch cable for kinking; removing the lock rod assemblies; using compressed air to blow out any debris or residual water; lubricating the door latch; loosening the two door glass run bolts; loosening the three door latch bolts; applying foam tape to the new shield; installing the new door latch water shield; installing a new screw into the top hole of the shield; and tightening the glass run and door latch bolts.[3]

**<u>Ford Issues "Customer Satisfaction Program"</u>**

49.     Despite issuing two TSBs and a national Safety Recall for every F-150 model for 2015, 2016, and 2017, Ford's troubled F-150 series continued to have problems.

50.     While the initial TSBs and Safety Recall dealt with a limited number of model years, Ford's latest "Customer Satisfaction Program 18N03" extended the reach of the program to include model years 2015 – 2018.[4]

51.     Similar to the Safety Recall, on September 26, 2018, Ford first notified its dealers of the new Customer Satisfaction Program 18N03.  Ford told its dealers that the new program was necessary and commanded that "[i]f a vehicle has exhibited a frozen door latch, dealers must perform customer satisfaction program 18N03."  (NEW VEHICLE DEMONSTRATION / DELIVERY HOLD – Safety Recall 17S33 – Supplement #1; Customer Satisfaction Program 18N03, September 26, 2018; attached as Exhibit F.)

52.     In October 2018, Ford informed consumers that "Ford has launched this additional customer satisfaction program 18N03, to provide an additional repair for owners who

---

[2] Ford had additional instructions for Crew Cab vehicles built on or before September 1, 2016 and Super Cab vehicles.
[3] If the vehicle was built on or before June 1, 2016, Ford also instructed its dealers to install a new lock rod to accommodate the new water shield.
[4] Just as occurred with Ford's 17S33 Safety Recall, in addition to applying to Ford's F-150s for model years 2015-2018, the Customer Satisfaction Program 18N03 also applied to Ford's F-Super Duty vehicles, and now was further extended to cover even more vehicles, including Ford's 2017-2018 F-250 – F-550 vehicles.

have experienced frozen door latches." (Customer Satisfaction Program 18N03, October 2018, attached as Exhibit G.)

53.     On October 12, 2018, Ford issued NEW VEHICLE DEMONSTRATION / DELIVERY HOLD – Safety Recall 17S33 – Supplement #2; Customer Satisfaction Program 18N03 (attached as Exhibit H.) Ford explained that the reason for the additional supplement was to provide an update "to include lubricating certain door latch and door cable components and modifying the door lock rod grommets." (*Id.*)

54.     After installing the door latch water shields in the affected doors as set forth in the procedures outlined in Safety Recall 17S33, Ford now instructed its dealers to "lubricate certain door latch and door cable components, modify door lock rod grommets and repair any kinks in the latch actuation cables. (*Id.*)

55.     Specifically, Ford instructed dealers to: modify the front door lock rod grommet; if equipped, disconnect the interior door handle cable retaining clips from the door sheet metal; using isopropyl alcohol and a clean shop cloth, thoroughly remove grease from the interior door handle cable mechanism; unseat the interior door handle cable rubber grommet and while holding the end of the cable in an upward position, spray lubricant down the cable for five seconds; using a bungee cord, secure the interior door handle cable to the door in an upward position to allow the lubricant time to run down into the cable, until the interior door panel is reinstalled; apply a light film of lubricant to the exterior door handle cable end and other indicated areas; apply door latch grease where the key cylinder lock rod attaches to the key lock rod lever; install the door panel weather shields; remove the bungee cord and reinstall door handle cable retaining clips; and install the front door interior trim panels.[5]

---

[5] As with the Safety Recall instructions, Ford had additional instructions for Crew Cab vehicles built on or before September 1, 2016 and Super Cab vehicles.

56.     Recognizing the enduring problems with its defective latches, Ford has provided an extraordinarily lengthy time period for F-150 owners to utilize Ford's services in an attempt to repair their vehicles and has notified consumers that their vehicles are "eligible for this repair through October 31, 2028." (Customer Satisfaction Program 18N03, October 2018, attached as Exhibit G.) The result is that impacted consumers with a 2015 F-150 vehicle have 13 years of coverage to deal with the defective door latches in those vehicles.

**Ford Fails To Disclose Existence Of Technical Services Bulletin**

57.     Despite the fact that the first TSB was issued in April 2015, a year before Mr. Flanery purchased his vehicle in April 2016, Mr. Flanery was never informed about the fact that "2015 F-150 SuperCab and SuperCrew Cab vehicles built on or before 3/25/2015 may exhibit inoperative door latches during or after freezing temperatures." Ford's omission, specifically the failure to inform Mr. Flanery of the defect, is material and if it had been disclosed to Mr. Flanery, would have resulted in him purchasing a different vehicle. Now disclosed in the press, in social media and in court files, the knowledge will similarly deter any prospective purchaser from buying this truck, resulting in a diminished value to the truck, for which plaintiff paid full price.

58.     Only after purchasing his Ford F-150, did Mr. Flanery, through his own experience, discover this elemental defect.

59.     Douglas Flanery purchased a brand-new Ford 2016 F-150 Platinum SuperCrew in April 2016 from Kings Ford in Cincinnati, Ohio.

60.     Prior to purchasing his 2016 F-150, neither Ford nor the dealership informed Mr. Flanery that Ford had issued TSB 16-0155 and that it applied to Mr. Flanery's vehicle.

61.     For the first year of his ownership, Mr. Flanery kept his F-150 in a garage and

experienced no issues with its door latches.

62.     Mr. Flanery then moved residences, and began to park his vehicle outside.

63.     Mr. Flanery took his F-150 to Dave Knapp Ford – Lincoln, Inc. in Greenville, Ohio on December 22, 2017.

64.     On that visit, Dave Knapp Ford indicated it performed the work outlined in Ford's Recall 17S33, and "installed rain caps on all 4 latches replace all 4 rods – lubed all 4 latches." Since then, Mr. Flanery has had numerous latch freezing incidents. These incidents only occur when the air temperature drops to or below freezing.

65.     When the latch freezes on Mr. Flanery's F-150, the latch will not close and secure the door, and Mr. Flanery either has to wait for the vehicle to warm up or drive holding the door closed.

66.     On January 2, 2018, Mr. Flanery again brought his F-150 to Dave Knapp Ford. This time, the dealer reported that "Cust[omer] states after recall [work was performed,] doors are not latching[.] Inspected both front doors & replaced both front door latches."

67.     But Mr. Flanery's problems with his F-150 continued.

68.     On November 19, 2018, Mr. Flanery returned to Dave Knapp Ford with his F-150 because his "driver[']s door is freezing." To address it, the dealer "installed [a] latch seal."

69.     The latch seal did not solve the problem.

70.     On December 26, 2018, Mr. Flanery had to bring his F-150 again to Dave Knapp Ford because the driver's side door would not latch close when it was cold. In response, Dave Knapp Ford "inspected, verified & replaced driver[']s door latch. Retested – passed."

71.     Left unsaid is how or under what conditions Dave Knapp Ford "retested" and "passed" the F-150, but the F-150 failed the real-world test.

72.     After experiencing continued door latch freezing issues, Mr. Flanery, for the fifth time, brought his vehicle in to Dave Knapp Ford on February 14, 2019.  This time the dealer "performed updated repair as per 18N03."

73.     Dave Knapp Ford also documented additional work it performed on Mr. Flanery's vehicle during his February 14, 2019 trip to the dealer.  That work was set out in a March 19, 2019 work order, indicating certain work Dave Knapp Ford performed on Mr. Flanery's vehicle. This time the dealer applied "Recall 19N02"[6] and "performed additional robustness actions on all affected doors."  It is uncertain if any of these "fixes" have solved the problems with Mr. Flanery's F-150.

**Ford's Problems Continue, But Ford Fails to Inform Consumers**

74.     Plaintiff's experience is far from unique.  Despite issuing the two TSBs, one in March 2015 and the second in November 2016, a Safety Recall, a Customer Satisfaction Program, and "19N02," Ford customers continue to experience the same problems.

75.     Indeed, on January 5, 2017 one customer complained:

> I took my 150 in, in early Dec '16 for the frozen latch issue, truck warmed up in the bay and they could not reproduce the latch failure, replaced the latch so they say. When I picked it up I specifically asked about a TSB service tech said there was none and that's the first thing they look for. Fast forward a month and some bitter cold in the Seattle area and same problem non latching door latch.

(https://www.fordf150.net/forums/viewtopic.php?t=123522, last visited Mar. 1, 2017.)

---

[6] "Recall 19N02" may be an additional field service action that supplements the "fixes" previously touted by Ford in TSB 15-0052, TSB 16-0155, Safety Recall 17S33, and Customer Satisfaction Program 18N03.  But Ford has not released the contents of "Recall 19N02" to consumers.  Regardless, "Recall 19N02" is as ineffective as the prior four "fixes," and it too has failed to remedy the defects in Mr. Flanery's F-150.

76.     Another customer complained on January 7, 2017: "Just picked mine up last night after the TSB fix and I put it through a touch free car wash and parked it. Three out of four door locks frozen."  (https://www.f150forum.com/f118/frozen-doors-tsb-done-doors-still-frozen-368732/, last visited Aug. 11, 2017.)

77.     Yet another customer complained on March 18, 2017, that "Had the TSB done yesterday. Mildly cool this am. This morning two out of four doors do not open - frozen latches." (https://www.f150forum.com/f118/frozen-doors-tsb-done-doors-still-frozen-368732/index12/, last visited Aug. 11, 2017.)

78.     Still another customer demonstrated, via a November 2018 video, the continued problems he has with his 2016 Ford F-150 SuperCrew even after the Customer Satisfaction Program 18N03 has been applied.  (https://www.youtube.com/watch?v=Fa_UD6q0qdY&t=15sm last visited Mar. 22, 2019.)

79.     The remarks after the video show nearly two dozen comments of consumers complaining about their continued problems with the defective, frozen door latches.  (*Id.*)

80.     And with full knowledge that its vehicles have a defective lock and latch problem in cold temperatures, Ford never disclosed this information to former, current, or potential owners, purchasers, or lessees of the serious and ongoing problem.  Instead, Ford has continued to market its vehicles in the same false and deceptive manner it has done throughout the class period.

## CLASS DEFINITION AND ALLEGATIONS

81.     Plaintiff brings this action on behalf of himself and all other similarly situated consumers.  Plaintiff expressly disclaims any intent to seek any recovery in this action for personal injuries that he or any class member may have suffered.

16

82.     Mr. Flanery brings this action on behalf of himself and all other similarly situated

consumers in the State of Ohio (the "Ohio Class") pursuant to Rule 23 of the Federal Rules of

Civil Procedure, and seeks certification of the following class:

> All consumers who, within the applicable statute of limitations
> period, purchased or leased in the State of Ohio a Ford F-150
> model vehicle for model years 2015, 2016, 2017, and 2018 (the
> "Class Vehicles").  Excluded from the class are Ford, its parents,
> subsidiaries, affiliates, officers and directors, judicial officers and
> their immediate family members and associated court staff
> assigned to this case, and those who purchased a Class Vehicle for
> resale.

83.     **Numerosity**.  This action is appropriately suited for a class action.  The members

of the class are so numerous that joinder of all members of the class is impracticable.  Plaintiff is

informed, believes, and thereon alleges, that the proposed class contains thousands of purchasers

or lessees of the Class Vehicles who have been damaged by Defendant's conduct as alleged

herein.  The precise number of class members is unknown to Plaintiff.

84.     **Existence and Predominance of Common Questions of Law and Fact**.  This

action involves questions of law and fact common to the class.  The common legal and factual

questions include, but are not limited to, the following:

- Whether Defendant failed to disclose material information regarding the Class
  Vehicles;

- Whether the alleged conduct constitutes violations of the law asserted;

- Whether the Class Vehicles contain the defect described above;

- Whether Ford knew or should have known about the defective door locks and
  latches, but failed to disclose that information to Plaintiff and Class members;

- Whether Ford omitted and concealed material information regarding the Class
  Vehicles;

- Whether Ford had and/or has a duty to disclose information about the
  defective locks and latches prior to selling or leasing the Class Vehicles to
  Plaintiff and Class members;

17

- Whether the Class members obtained the benefits that Defendant represented the Class Vehicles have;

- Whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss; and

- Whether, as a result of Defendant's misconduct, the class is entitled to monetary and statutory damages, as well as equitable and injunctive relief.

85. **Typicality**. Plaintiff's claims are typical of the claims of the members of the class, because, *inter alia*, all class members have been injured through the uniform misconduct described above, and were subject to Defendant's failure to disclose material information, including information that accompanies the sale or lease of each and every Class Vehicle. Moreover, the Plaintiff's claims are typical of the class members' claims. Plaintiff is advancing the same claims and legal theories on behalf of himself and all members of the class.

86. **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the members of the class. Plaintiff purchased a Class Vehicle; and he was harmed by Defendant's deceptive omissions. Plaintiff returned his vehicles multiple times for repair, and repairs have never been performed satisfactorily. As a result, Plaintiff has suffered an injury in fact as a result of Defendant's conduct, as did all class members who purchased Class Vehicles. Plaintiff has no adverse or antagonistic interests to those of the class.

87. **Superiority**. A class action is superior to other methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would be virtually impossible for a member of the class, on an individual basis, to obtain effective redress for the wrongs done to him or her. Furthermore, even if the class members could afford such individualized litigation, the court system could not. Individualized litigation would create the

danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

88. Plaintiff seeks monetary damages, including statutory damages on behalf of the entire class, and other equitable relief on grounds generally applicable to the entire class, to enjoin and prevent Defendant from engaging in the acts described. Unless a Class is certified, Defendant will be allowed to profit from its deceptive practices, while Plaintiff and the members of the Class will have suffered damages. Unless a Class-wide injunction is issued, Defendant will continue to commit the violations alleged, and the members of the Class and the general public will continue to be deceived.

89. Defendant has acted and refused to act on grounds generally applicable to the Class, making final injunctive relief appropriate with respect to the Class as a whole.

### FIRST CAUSE OF ACTION
#### (Violation of Ohio Code § 1345.01 *et seq.*)

90. Mr. Flanery realleges and incorporates by reference all paragraphs as though fully set forth herein.

91. Defendant alone possessed material information that the door locks and latches on the F-150 trucks do not function correctly at temperatures at or below freezing. However, Defendant has failed to disclose that material information about the Class Vehicles, and so, has deceived reasonable consumers who purchase or lease the products. Reasonable consumers would believe that the door locks and latches on Defendant's Class Vehicles would operate

19

correctly at temperatures at or below freezing. In reality, Defendant's Class Vehicles are unsafe and do not operate as Defendant claims. Defendant failed to disclose material information about its products, those omissions were misleading in a material respect to consumers, and resulted in the purchase of Defendant's products.

92.     Defendant has deceptively marketed, promoted, distributed, and sold its Class Vehicles.

93.     Mr. Flanery and the Ohio Class have been aggrieved by and have suffered losses as a result of Defendant's violations of Section 1345.01, *et seq.* of the Ohio Consumer Sales Practices Act. By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce, Mr. Flanery and the Ohio Class have been substantially injured by overpaying for a product that has diminished value due to its defective nature. In addition, Mr. Flanery and the Ohio Class have incurred "out-of-pocket" expenses in driving to and from their dealers and/or repair facilities, as well as expending considerable time in doing so.

94.     By reason of the foregoing, Defendant's conduct, as alleged herein, constitutes deceptive acts and practices in violation of Section 1345.01, *et seq.* of the Ohio Consumer Sales Practices Act, and Defendant is liable to Mr. Flanery and the Ohio Class for the actual damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus statutory damages, treble damages, and attorneys' fees and costs.

95.     Mr. Flanery and the Ohio Class further demand injunctive relief enjoining Defendant from continuing to engage in, use, or employ any act, including advertisements, packaging, or other representations, prohibited by Section 1345.01, e*t seq.* of the Ohio Consumer Sales Practices Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant as follows:

A.      Certifying this action as a class action as soon as practicable, with the classes as defined above, designating Plaintiff as the named class representative, and designating the undersigned as Class Counsel.

B.      On Plaintiff's First Cause of Action, awarding against Defendant the damages that Mr. Flanery and the Ohio Class have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus treble damages.

C.      Awarding Plaintiff and the Class interest, costs, and attorneys' fees.

D.      Enjoining Defendant from continuing to engage in, use, or employ any act, including advertisements, packaging, or other representations, prohibited by Section 1345.01, *et seq.* of the Ohio Consumer Sales Practices Act.

E.      Awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:       Milwaukee, Wisconsin
             April 16, 2019

                                        Respectfully Submitted,

                                        **HANSEN REYNOLDS LLC**

                                        /s/ Michael C. Lueder
                                        Michael C. Lueder, Esq.
                                        Ohio Bar # 0049350
                                        301 N. Broadway, Suite 400
                                        Milwaukee, WI 53202-2660
                                        Telephone: (414) 273-8474
                                        Facsimile: (414)273-8476
                                        mlueder@hansenreynolds.com

                                        **DENLEA & CARTON LLP**

                                        Jeffrey I. Carton, Esq.
                                        Robert J. Berg, Esq.
                                        Myles K. Bartley
                                        2 Westchester Park Drive, Suite 410
                                        White Plains, New York 10604
                                        Telephone: (914) 331-0100
                                        Facsimile: (914) 331-0105
                                        jcarton@denleacarton.com
                                        rberg@denleacarton.com
                                        mbartley@denleacarton.com


                                        *Attorneys for Plaintiff*